CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

FEB 2 7 2009

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

THOMAS F. PIEPENHAGEN,                )
                                      )     Civil Action No. 7:08-CV-00236
    Plaintiff,                    )
                                      )     **MEMORANDUM OPINION**
v.                                    )
                                      )     By: Hon. James C. Turk
OLD DOMINION FREIGHT LINE, INC.       )
EMPLOYEE BENEFIT PLAN,                )     Senior United States District Judge
                                      )
    Defendant.                    )

This matter is presently before the court on cross-motions for summary judgment filed by Plaintiff Thomas F. Piepenhagen ("Piepenhagen") (Docket No. 22), and Defendant Old Dominion Freight Line, Inc. Employee Benefit Plan ("ODFL") (Docket No. 24). Piepenhagen originally filed this cause of action after ODFL denied him long-term disability benefits under the terms of its employer-sponsored welfare benefit plan. Piepenhagen claims that ODFL violated the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., when it denied him those benefits, and he now seeks a court determination of his rights under ODFL's Employee Benefit Plan, an award of past benefits due, and attorney's fees. Following the parties' filing of their respective Motions for Summary Judgment, the court heard argument on December 4, 2008. Based on the existing record, memoranda submitted by the parties, and argument presented at the hearing, the court will grant ODFL's Motion for Summary Judgment and deny Piepenhagen's Motion for Summary Judgment.

## I.

At all times relevant to the instant case, ODFL employed Piepenhagen as a line haul truck driver. As an ODFL employee, Piepenhagen was entitled to disability benefits pursuant to the terms and conditions of ODFL's Employee Benefit Plan ("Plan"). ODFL served as the

Administrator for the Plan, but it appointed ACS Benefit Services, Inc. ("ACS") to function as a third party administrator. In that capacity, ACS was responsible for processing claims and fulfilling various administrative duties, but it did not exercise any discretion in awarding or denying claims. The Employee Benefit Plan Document ("Plan Document") expressly reserved "discretionary authority" for ODFL to determine the "eligibility for plan benefits or to construe the terms of the plan." (A.R. at 23).[1]

## A. Benefits History

On February 8, 2005, Piepenhagen suffered a myocardial infarction (commonly referred to as an "MI" or heart attack) while operating an ODFL tractor-trailer near Columbus, Ohio. Piepenhagen experienced light-headedness and chest pain, but he was able to maneuver the vehicle off the interstate. Piepenhagen then contacted 911, and paramedics transported him to an emergency room where he received thrombolytics, underwent cardiac catheterization, and received angioplasty and stenting to his right coronary artery.

Shortly after this incident, Piepenhagen applied for short-term disability benefits. ODFL paid those benefits in full for thirteen weeks. Piepenhagen then applied for long-term disability benefits pursuant to the terms of the Plan Document and its definition of "disability" as it applies to the first twenty-four months of total disability (the "own occupation" period). (A.R. at 12). According to that definition, ODFL approved the claim based upon Piepenhagen's inability to perform the "regular and customary duties of [his] employment." (A.R. at 12).[2]

---

[1] On June 10, 2008, in accordance with a Scheduling Order entered by this court on May 28, 2008 (Docket No. 10), ODFL filed a redacted copy of the Administrative Record, which is a copy of ODFL's claim file for Piepenhagen's claim for long-term disability benefits. The court will refer to this Administrative Record, as supplemented by ODFL in response to Piepenhagen's Objections to the Authenticity of the Administrative Record (Docket No. 19) , as "A.R." and will cite to it in the following manner: bates number "OD000023" is "A.R. 23."

[2] The Plan Document provides as follows: "Total disability, as it applies to this benefit [i.e., during the "own occupation" period], shall mean that you are prevented solely by an _illness_ or _injury_ from performing the regular and

On October 15, 2005, the Social Security Administration ("SSA") approved Piepenhagen for disability income benefits. According to Piepenhagen's submissions to the court, he was entitled to those benefits on account of the physical limitations resulting from his heart attack, coupled with a preexisting loss of three fingertips on his right hand caused by an industrial accident in 1988. The SSA commenced payment of the benefits in October 2005, and it has continued to pay Piepenhagen ever since.

On February 3, 2006, ODFL notified Piepenhagen that it had terminated his long-term disability benefits effective December 1, 2005. As its reasoning, ODFL explained that Piepenhagen's claim indicated that his disability was "in part or wholly related to a psychological illness" and that the Plan Document contained an exclusion based upon "any condition caused, contributed to or made disabling by a psychosis or neurosis." (A.R. at 69-71B). Piepenhagen appealed this decision, but ODFL denied that appeal on September 13, 2006. The matter then became the subject of litigation in this court in Case No. 7:06-cv-718.

On April 20, 2007, pursuant to a Settlement Agreement and Release ("the Settlement Agreement"), the court dismissed with prejudice all claims for disability benefits during the "own occupation" period. (A.R. at 142-43). The court also dismissed, but without prejudice, Piepenhagen's claim for disability benefits for the period subsequent to the first twenty-four months of claimed disability (the "any occupation" period). (A.R. at 137-40, 144). This latter claim was "remanded to the plan administrator" to be considered under the terms of the Plan Document as modified by the Settlement Agreement. (A.R. 137-40, 144). Specifically, the Settlement Agreement indicated that Piepenhagen's "any occupation" period claim would be considered under the following definition of "illness": "Any bodily sickness, disease or disorder,

customary duties of your employment. You do not have to be confined to your home, but must be under the regular and continuing care of a <u>physician</u>." (A.R. at 12) (emphasis in original).

Case 7:08-cv-00236-JCT   Document 30   Filed 02/27/09   Page 3 of 26   Pageid#: 735

excluding mental/nervous disorders except to the extent such mental/nervous disorders have a physical manifestation and then only to the extent of such manifestation." (A.R. at 137).

On June 19, 2007, Piepenhagen submitted to ODFL his "remand" claim for benefits during the "any occupation" period. On July 6, 2007, ODFL notified Piepenhagen that, "after considering the remand claim and the entire record," it had concluded that Piepenhagen was "not disabled under the terms of the Plan" and "not entitled to long-term disability benefits." (A.R. at 164). Piepenhagen appealed again, but ODFL denied that appeal on February 8, 2008.

## B. Piepenhagen's Medical History[3]

Soon after his hospital discharge in February 2005, Piepenhagen returned to Roanoke, Virginia, for follow-up care by Dr. Andrew J. Maiolo, a cardiologist, and Dr. Vashist Nobbee, a primary care physician. In an initial assessment dated February 14, 2005, Dr. Maiolo noted that Piepenhagen "had no further chest discomfort or anginal symptoms . . . [n]o palpitations or racing of the heart . . . [and] [n]o dizziness or syncope." (A.R. at 35). Dr. Maiolo further noted that, in his opinion, Piepenhagen could "return to work on 02/24/05." (A.R. at 36).

On March 3, 2005, Dr. Nobbee evaluated Piepenhagen and noted in his assessment that Piepenhagen had "[n]o chest pain or SOB" (shortness of breath) and was generally "doing well." (A.R. at 37). Despite Piepenhagen's good condition, however, Dr. Nobbee thought it "might be worthwhile to keep [him] off work until his cardiac status [was] fully controlled given the strong risks." (A.R. at 37). Therefore, Dr. Nobbee continued Piepenhagen on his heart medications, scheduled to reevaluate him in May 2006, and noted that Piepenhagen would "remain off work until that time." (A.R. at 37).

---

[3] On account of Piepenhagen's allegation (discussed later herein) that ODFL misrepresented certain evidence in making its disability determination, the court finds it necessary and appropriate to include a detailed recitation of the facts drawn from an extensive review of the Administrative Record.

4

On March 9, 2005, Dr. Maiolo performed a follow-up evaluation on Piepenhagen and indicated in his report that Piepenhagen was "doing reasonably well." (A.R. at 38). Piepenhagen was not suffering from shortness of breath, chest pain or anginal symptoms, and he was "otherwise without complaints." (A.R. at 38). Dr. Maiolo also noted in his report that Piepenhagen discussed his plans of "returning to work as a truck driver . . . in mid to late July." (A.R. at 38). In Dr. Maiolo's opinion, after Piepenhagen underwent "an exercise Cardiolite scan" at the beginning of July and completed a full physical with Dr. Nobbee in mid-July, "at that time, [Piepenhagen could] be cleared to return to work." (A.R. at 38-39).

On May 5, 2005, Dr. Nobbee evaluated Piepenhagen again and indicated in his assessment that, physically, Piepenhagen was "doing quite well." (A.R. at 40). Piepenhagen had been exhibiting "significant symptoms of personality changes, mood swings, and anxiety and anger," but Dr. Nobbee opined that these psychological affects were "not unexpected given [Piepenhagen's] CAD [Coronary Artery Disease] and the fact that [Piepenhagen] . . . had to stay at home." (A.R. at 40). Dr. Nobbee concurred with Dr. Maiolo's recommendation that following a physical exam and stress test, Piepenhagen could return to work.

On June 16, 2005, Dr. Nobbee filled out an "Attending Physician's Statement" as part of an ODFL "Disability Continuation Report." (A.R. at 33). As part of his responses, Dr. Nobbee indicated that Piepenhagen's last visit occurred on May 5, 2005, and at that time, Piepenhagen's only "subjective symptoms" were "[p]ersonality changes, mood swing[s], anxiety, [and] anger." (A.R. at 33). Dr. Nobbee also indicated that Piepenhagen was "now totally disabled" by checking a "yes" box under the words "for any occupation." (A.R. at 33). As a qualification to this checkmark, however, Dr. Nobbee wrote in the "Comments" section (located below the yes/no boxes) that, "[Piepenhagen] may be able to return to work [in] late July." (A.R. at 33).

5

On July 26, 2005, Dr. Nobbee saw Piepenhagen for an annual physical exam. Following that exam, Dr. Nobbee drafted a letter stating that Piepenhagen had "recovered well from his recent coronary artery event and physically is doing well." (A.R. at 41). Dr. Nobbee noted concern, however, that Piepenhagen experienced "mental issues regarding fear of driving and his overall medical condition . . . akin to post traumatic stress disorder." (A.R. at 41). As a result, Dr. Nobbee referred Piepenhagen to Dr. Lola Byrd, a licensed clinical psychologist, and recommended that Piepenhagen undergo a "thorough psychologic evaluation to determine the competency of his returning to work as a long-distance truck driver." (A.R. at 41).

In January 2006, Dr. Nobbee submitted a letter in support of Piepenhagen's long-term disability claim. In that letter, Dr. Nobbee indicated that Piepenhagen had "several medical comorbidities including advanced coronary artery disease as well as significant symptoms of depression and anxiety related to his medical comorbidities." (A.R. at 46). Dr. Nobbee further stated that he "recommended permanent disability given [Piepenhagen's] inability to continue his present employment as a truck driver." (A.R. at 46). Dr. Nobbee also filled out a second Attending Physician's Statement as part of the claim process. In that statement, Dr. Nobbee noted that Piepenhagen had been diagnosed with "coronary heart disease, major depressive disorder, and hyperlipidemia." (A.R. at 57). Dr. Nobbee further indicated that Piepenhagen was permanently disabled, both by writing it under "prognosis—work" and by responding to the question "[i]s patient now totally disabled?" by check-marking a "yes" box underneath the heading "[f]or any occupation." (A.R. at 59). Dr. Nobbee also attached a January 9, 2006, letter stating, "I [Dr. Nobbee] had recommended permanent disability [for Piepenhagen] given his inability to continue his present employment as a truck driver." (A.R. at 58).

On February 3, 2006, ODFL denied Piepenhagen's claim for long-term disability benefits. Piepenhagen appealed the decision on August 1, 2006. In support of his appeal, Piepenhagen claimed that certain medications caused him to "feel fatigued" and "light-headed" and contributed to "poor concentration or poor memory." (A.R. at 113). Piepenhagen also submitted a letter from Dr. Nobbee, dated August 1, 2006, which stated that Piepenhagen's "medical comorbities" "preclude continued employment as a truck driver." (A.R. at 124B). The letter further stated that it was Dr. Nobbee's "strong recommendation . . . that [Piepenhagen] avoid his present occupation and probably be placed on permanent disability." (A.R. at 124B). In coming to that conclusion, Dr. Nobbee considered Piepenhagen's cardiac problems, his need for "significant psychologic counseling" and "antidepressant and anxiolytic therapy," and some recent claims of "severe neck pain," which led to the discovery of "MRI evidence of severe degenerative joint and disk disease of the cervical spine." (A.R. at 124B).

On September 18, 2006, Dr. Maiolo evaluated Piepenhagen for a third time. According to Dr. Maiolo's report, Piepenhagen was "doing reasonably well." (A.R. at 131). Piepenhagen was experiencing "occasional chest pain primarily in the evenings," approximately "two to three times per week," the "frequency and severity [of which] depend[ed] on his stress level," but Dr. Maiolo stated that Piepenhagen "[had] Nitroglycerin and this [did] help when he use[d] it." (A.R. at 131-32). Dr. Maiolo noted no other complaints.

On November 13, 2006, Dr. Nobbee examined Piepenhagen as part of another annual physical examination. Dr. Nobbee's assessment indicates that Piepenhagen was "doing quite well" and had no "active complaints." (A.R. at 133). Piepenhagen had recently completed a stress test, "which was essentially unchanged," and he had "one small area of visible ischemia [that] Dr. Maiolo [was] keeping an eye on." (A.R. at 133). Dr. Nobbee further noted that

Piepenhagen experienced "no neck pain," his"[d]epression screen . . . was negative," and his "[f]unctional status [was] superb." (A.R. at 134).

In an assessment dated February 13, 2007, Dr. Maiolo indicated that Piepenhagen was "doing reasonably well." (A.R. at 135). Dr. Maiolo noted that Piepenhagen experienced "chest discomfort" a "couple times per week," occurring both "at rest [and] exertion," but this discomfort was still "relieved by Nitroglycerin." (A.R. at 135). Dr. Maiolo also noted that, "[p]sychologically, [Piepenhagen] appeared comfortable and stable." (A.R. at 135).

Finally, on April 24, 2007, Dr. Maiolo completed a Cardiac Residual Functional Capacity Questionnaire. (A.R. at 148-53). As part of his answers, Dr. Maiolo indicated that Piepenhagen's New York Heart Association Functional Classification was a Class II.[4] (A.R. 148, 157). Dr. Maiolo also indicated that Piepenhagen experienced anginal pain one to two times per week and that "moderate" stress played a role in bringing on the symptoms. (A.R. at 148-49). Given these medical limitations, Dr. Maiolo determined that Piepenhagen was "capable of low stress jobs" as Piepenhagen's "experience of cardiac symptoms" was "seldom" "severe enough to interfere with attention and concentration." (A. R. at 150). Dr. Maiolo also determined that Piepenhagen could "occasionally" lift and carry twenty pounds in a competitive work situation, could "occasionally" twist, stoop, crouch, climb ladders and climb stairs,[5] and could walk approximately two city blocks without rest. (A.R. at 151-52). Dr. Maiolo advised, however, that Piepenhagen should avoid even moderate exposure to extreme cold or heat, wetness, humidity, noise, fumes and/or hazards. Dr. Maiolo also found that Piepenhagen could

---

[4] In 1928, the New York Heart Association published a classification of patients with cardiac disease based on clinical severity and prognosis. (A.R. at 155). The most recently updated Class II classification provides as follows: "Patients with cardiac disease resulting in slight limitation of physical activity. They are comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea or anginal pain." (A.R. 155).

[5] According to the Cardiac Residual Functional Capacity Questionnaire's instructions, "occasionally' means 6% to 33% of an 8-hour working day." (A.R. at 152).

8

sit or stand for forty-five minutes before needing to get up or sit down, respectively, but that Piepenhagen would need to take two to three unscheduled breaks during an eight-hour work shift and that each rest period would last an average of twenty minutes. Dr. Maiolo also found that Piepenhagen would experience "good days" and "bad days" based on his impairments and that he would miss approximately one day per month as a result. (A.R. at 153).

## II.

Pursuant to Federal Rule of Civil Procedure 56(c), a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (2008); Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). When faced with cross-motions for summary judgment, a court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted). For each motion, "the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." Id. (quoting Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)). "The party who bears the burden of proof on an issue at trial, however, cannot survive summary judgment without forecasting evidence sufficient to sustain his or her burden of proof on that point." McIntyre v. Aetna Life Ins. Co., 581 F. Supp. 2d 749, 756 (W.D. Va. October 8, 2008) (citing Celotex, 477 U.S. at 327).

When reviewing a denial of benefits in a case brought under ERISA, a court should apply a de novo standard of review unless the plan in question provides otherwise or it grants the administrator or fiduciary the discretionary authority to determine eligibility for benefits or to

construe the terms of the plan. Metropolitan Life Insurance Company v. Glenn, 128 S. Ct. 2343,

2347-48 (2008) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111-113 (1989)). If

the plan in question does vest in its administrator discretionary authority, "a deferential standard

of review is appropriate." Id. at 2348 (emphasis and citations omitted). This is true even if the

administrator is acting under a conflict of interest. Id. In that circumstance, a court must

continue to apply a deferential standard of review while weighing the conflict "as a factor in

determining whether there is an abuse of discretion." Id. (emphasis and citation omitted).

The Supreme Court focused on this last principle in Metropolitan Life Insurance v.

Glenn, 128 S. Ct. at 2343. In Glenn, the Court held that when a plan administrator serves a dual

role of both evaluating and paying out disability benefits claims, the dual role itself creates a

conflict of interest. Glenn, 128 S. Ct. at 2346, 2348; see also Champion v. Black & Decker

(U.S.) Inc., 550 F.3d 353, 357 (4th Cir. 2008).[6] The Court further held, however, that the

presence of a conflict of interest did not change the standard of review from a deferential review,

normally applied in the review of discretionary decisions, to a de novo review, or some other

hybrid standard. Glenn, 128 S. Ct. at 2350. Instead, "when reviewing an ERISA plan

administrator's discretionary determination, a court must review the determination for abuse of

discretion and, in doing so, take the conflict of interest into account only as "one factor among

many" in deciding whether the administrator abused its discretion. Champion, 550 F3d. at 357

(quoting Glenn, 128 S. Ct. at 2351). The presence of a conflict of interest should not otherwise

lead to "special burden-of-proof rules, or other special procedural or evidentiary rules, focused

narrowly upon the evaluator/payor conflict." Id. at 2351.

---

[6] For example, the Supreme Court found a conflict of interest in Glenn when an insurance company served as both administrator and insurer of a plan and as administrator it had discretionary authority to determine claims and as insurer it paid the claims. 128 S. Ct. at 2346. The Court specifically noted that the same conflict is created when an employer serves in a similarly dual role. Id. at 2348; see also Champion, 550 F.3d at 357.

Accordingly, "[a]s [ERISA law] stands after Glenn, a conflict of interest is readily determinable by the dual role of an administrator or other fiduciary, and courts are to apply simply the abuse of discretion standard for reviewing discretionary determinations by that administrator, even if the administrator operated under a conflict of interest." Champion, 550 F.3d at 357. Pursuant to this deferential standard of review, a court must uphold a discretionary determination of a plan administrator if the decision in question was reasonable. Id. (citing Guthrie v. Nat'l Rural Elec. Coop. Assoc. Long-Term Disability Plan, 509 F.3d 644, 650 (4th Cir. 2007)). A court is obligated to uphold a reasonable decision "even if another, and arguably a better, decisionmaker might have come to a different, and arguably a better result." Evans v. Eaton Corp. Long-term Disability Plan, 514 F.3d 315, 326 (4th Cir. 2008).

A plan administrator's decision is reasonable if it is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Id. at 322 (quoting Bernstein v. CapitalCare, Inc., 70 F.3d 783, 788 (4th Cir. 1995). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," being "more than a mere scintilla," but "less than the weight of the evidence." Winebarger v. Liberty Life Assur. Co., 571 F. Supp. 2d 719, 722 (W.D. Va. Aug. 15, 2008). In considering whether an administrator's decision is reasonable, one important factor is the "adequacy of the materials considered to make the decision and the degree to which they support it." Id. at 722 (quoting Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 342 (4th Cir. 2000)). The Fourth Circuit has acknowledged seven other nonexclusive factors that may be considered as well, including the type of inherent conflict of interest as was at issue in Glenn.[7] Champion, 550 F.3d at 359 (quoting Booth, 201 F.3d at 342-43).

---

[7] Those factors are as follows:

In the instant case, the court finds that an abuse of discretion standard of review is appropriate. The Plan Document explicitly reserves "discretionary authority" for ODFL to determine the "eligibility for plan benefits or to construe the terms of the plan," and it provides ODFL with the ability to "amend, modify, or terminate" coverage available under the terms of the Plan Document "in any manner, at any time." (A.R. at 23-24). The court also finds that an inherent conflict of interest exists, given the fact that ODFL both evaluates and pays its disability claims. As a result, the court will uphold ODFL's decision to terminate Piepenhagen's "any occupation" disability benefits only if the decision was reasonable and supported by substantial evidence. Evans, 514 F. 3d at 322. In making that determination, the court will consider ODFL's conflict of interest as only "one factor among many" in deciding whether there was an abuse of discretion. Champion, 550 F3d. at 357 (quoting Glenn, 128 S. Ct. at 2351).

### III.

Pursuant to the Plan Document's language, a plan participant, like Piepenhagen, is "totally disabled" and entitled to long-term disability benefits during the "any occupation" period if, due to "illness or injury," he is unable "to engage in any gainful occupation for which [he is] reasonably qualified by education, training or experience." (A.R. at 12). The Settlement Agreement specifically modified the term "illness" to mean as follows: "Any bodily sickness, disease or disorder, excluding mental/nervous disorders except to the extent such mental/nervous

---

(1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Booth, 201 F.3d at 342-43 (footnote omitted).

disorders have a physical manifestation and then only to the extent of such manifestation." (A.R. at 137). Pursuant to these terms, ODFL concluded that Piepenhagen was not totally disabled.

## A. ODFL's Decisionmaking Process and the Adequacy of its Support

Piepenhagen now contends that ODFL abused its discretion in making his disability determination because it selectively relied on evidence that supported its denial decision while simultaneously disregarding evidence of total disability. Piepenhagen also alleges that ODFL's denial letters distort the medical assessments issued by his treating physicians, taking statements out of context or ignoring their sources entirely. In response, ODFL claims that its decision to deny benefits was supported by substantial evidence. In particular, ODFL argues that its denial letters rely on numerous assessments by Piepenhagen's treating physicians (including exam reports, attending physician statements, letters by Dr. Nobbee, and a Cardiac Residual Functional Capacity Questionnaire by Dr. Maiolo), all of which support ODFL's conclusion that Piepenhagen is fully capable of engaging in gainful occupations.

The court finds Piepenhagen's arguments on this issue unpersuasive. The Administrative Record—ODFL's denial letters, in particular—contains considerable evidence of ODFL's deliberate and principled reasoning process in analyzing (and ultimately denying) Piepenhagen's long-term disability claim. There is no indication that ODFL ignored any evidence of Piepenhagen's disability or that it distorted statements made by Piepenhagen's treating physicians. There is similarly no indication that ODFL performed an unreasonable interpretation of medical evidence or that it (as Piepenhagen termed it) "play[ed] doctor" by providing expert medical opinions about Piepenhagen's condition. (Pl's Reply Mem. in Supp. of Mot. for Summ. J. at 16). To the contrary, the court finds that ODFL undertook a "reasoned and principled" decisionmaking process when reviewing Piepenhagen's long-term disability claim, Booth, 201

F.3d at 342-43, and it supported its disability determination with adequate materials, both in number and quality. See id. (listing as one factor of reasonableness the "adequacy of the materials considered to make the [disability] decision and the degree to which they support it").

For example, ODFL's decisionmaking process is illustrated aptly in its initial "any occupation" denial letter, dated July 3, 2007. In coming to its decision that Piepenhagen was not totally disabled, ODFL cites to several assessments of Dr. Maiolo and Dr. Nobbee. Prominently featured among these sources is Dr. Maiolo's Cardiac Residual Functional Capacity Questionnaire. The letter also refers to an observation of Dr. Nobbee, stating that Piepenhagen's "functional status is superb," (A.R. at 163), and one of Dr. Maiolo, indicating that Piepenhagen continues to suffer from "occasional chest pain primarily in the evenings" but has "no radiation of his discomfort" or dizziness or syncope. (A.R. at 163). On this evidence, and "after considering the remand claim and the entire record," ODFL concludes that nothing in the record appears to contradict Dr. Nobbee's opinion that Piepenhagen had "recovered well from his recent coronary artery event and physically is doing well." (A.R. at 41, 163).

Piepenhagen now contends that the denial letter conspicuously fails to mention the context of the physician observations upon which ODFL primarily bases its decision. Piepenhagen also argues that ODFL wrongly (and "blithely") comes to its decision despite Dr. Nobbee's Attending Physician's Statement, dated January 30, 2006, indicating that Piepenhagen was permanently disabled. (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 18).

The court finds that a plain reading of the Administrative Record disproves these allegations. First, the denial letter clearly states that Dr. Nobbee made his observations when he "conducted [Piepenhagen's] annual physical." (A.R. at 163). The letter also relies on multiple other assessments—all unrelated to an annual physical exam—and references extensively a

14

functional capacity questionnaire that examines Piepenhagen's vocational limitations in terms of his cardiac capacity. The court freely admits that the denial letter fails to mention every one of Dr. Maiolo's answers on the Cardiac Residual Functional Questionnaire and/or the specific questions that prompted those answers, but the selected portions cited by ODFL do not mischaracterize or "ignore the trust" of the questionnaire as a whole. See Myers v. Hercules, Inc., 2001 U.S. App. LEXIS 11906, at *16-17, 20 (4th Cir. Va. 2001) (finding an abuse of discretion when a plan administrator reached its decision to deny long-term disability benefits by misreading some evidence and taking other bits of evidence out of context).

Second, the court finds it significant that Dr. Nobbee qualified each of his statements (including check marks) mentioning "permanent disability" with an accompanying reference to Piepenhagen's previous job as a truck driver. (See e.g., "Pt. may be able to return to work [as a truck driver] in late July." (June 16, 2005 Attending Physician's Statement) (A.R. at 33) (emphasis added); "As a result of this, I had recommended permanent disability given his inability to continue his present employment as a truck driver." (Letter attached to January 30, 2006 Attending Physician's Statement) (A.R. at 46) (emphasis added); "Mr. Piepenhagen has asked me to document in a letter to you his medical comorbidities including those that in my opinion preclude continued employment as a truck driver." (Letter dated August 1, 2006) (A.R. at 124B) (emphasis added)). Faced with these qualifying remarks, it would have been improper for ODFL to follow Dr. Nobbee's mention of the words "permanent disability" without putting them into their proper context. To do otherwise would be to mischaracterize the medical reports as a whole and cheapen the disability determination into an arbitrary word-search. The Plan Document requires more from its administrators—a true and accurate understanding of the medical evidence—and the court finds no error in ODFL's fulfillment of that obligation. See

Case 7:08-cv-00236-JCT   Document 30   Filed 02/27/09   Page 15 of 26   Pageid#: 747

Booth, 201 F.3d at 342-43 (listing as one factor of reasonableness "whether the decisionmaking process was reasoned and principled").

Finally, although not challenged in this same regard, the court finds that Piepenhagen's arguments are equally as unpersuasive when they are applied to ODFL's second denial letter, dated February 8, 2008. In that letter, before denying Piepenhagen's appeal, ODFL sets forth the same treating physician assessments as it did on July 3, 2007, and it addresses, specifically, each additional "point[] to consider" alleged in Piepenhagen's appeal.[8] (A.R. at 169-70). The court finds no indication that the letter mischaracterizes any medical evidence or fails to consider Piepenhagen's medical condition as a whole (including preexisting injuries). See Guthrie v. Nat'l Rural Elec. Coop. Ass'n Long-Term Disability Plan, 509 F.3d 644, 652 (4th Cir. 2007) (finding that a plan administrator's "failure to consider [plaintiff's] constellation of medical issues denied [plaintiff] a full and fair review"). For that reason, and for the reasons stated above, the court finds no abuse of discretion with respect to ODFL's decisionmaking process and/or the adequacy of its support.

## B. Vocational Analysis

Piepenhagen also contends that ODFL's decision to deny him long-term disability benefits was an abuse of discretion because ODFL failed to have a vocational expert analyze his occupational skills and experience. According to Piepenhagen, the heart attack rendered him unable to perform the basic duties of any job, and it was improper for ODFL to rely on Dr. Maiolo's opinion that he was medically able to perform "low stress jobs" when neither Dr. Maiolo nor Dr. Nobbee indicated what specific jobs, if any, for which he might be qualified. In

---

[8] The additional points to consider included: the Social Security Administration's award of disability income benefits; the work restrictions included as part of Dr. Maiolo's Cardiac Residual Function Questionnaire; the purported effects of Piepenhagen's medications; the lasting effects of the Mr. Pipenhagen's loss of the tips of his right index, middle, and ring fingers; and an allegation that ODFL failed to consider Piepenhagen's complete physical condition (including any/all preexisting conditions). (A.R. at 169-70).

Piepenhagen's opinion, ODFL was required to utilize a vocational expert opinion, an analysis of the Dictionary of Occupational Titles, and/or a transferable skills analysis, and its failure to do so is "tantamount to making [the] denial unreasonable per se." (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 13).

The court disagrees. As an initial matter, six circuit courts have ruled on the question of whether a vocational analysis is required before an administrator determines whether or not a claimant is disabled under an "any occupation" standard. Not a single court has held that vocational evidence is required per se. Rather, "courts have consistently allowed for a case-by-case determination of whether a vocational or occupational assessment is required when deciding whether a claimant is able to perform "any occupation" as that term is defined by the [Plan Document]." Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1289 (10th Cir. 2002). See Pari-Fasano v. ITT Hartford Life & Accident Ins. Co., 230 F.3d 415, 420-21 (1st Cir. 2000) (vocational assessment not necessary in light of substantial medical evidence and conclusions of reviewing physicians that claimant had no more than minor restrictions on her ability to work); Quinn v. Blue Cross & Blue Shield Ass'n, 161 F.3d 472, 476 (7th Cir. 1998) (administrator under no obligation to undertake full-blown vocational evaluation of claimant's job and abilities, but has duty to make reasonable inquiry into type of skills possessed by claimant and whether skills may be used at another job in the same salary range); McKenzie v. Gen. Tel. Co. of California, 41 F.3d 1310, 1317 (9th Cir. 1994) (consideration of vocational evidence unnecessary where evidence in record supports conclusion that claimant does not have impairment preventing him from performing some identifiable job); Duhon v. Texaco, Inc., 15 F.3d 1302, 1309 (5th Cir. 1994) (reviewing court determines on case-by-case basis whether, under particular facts, plan administrator abused discretion by not obtaining opinion of vocational rehabilitation expert);

Potter v. Connecticut Gen. Life Ins. Co., 901 F.2d 685, 686 (8th Cir. 1990) (no need for vocational expert testimony in light of substantial other evidence claimant not disabled).

In the absence of a Fourth Circuit case addressing this issue, the court finds it appropriate to adopt the aforementioned—and persuasive—reasoning of these six circuit courts. In deciding whether a vocational expert was necessary in the instant case, the court will look at the particular circumstances and determine whether the ODFL "claims administrator [could] garner substantial evidence to demonstrate that [Piepenhagen] is, in fact, able to perform other occupations (within the definition set out by [the Plan Document]) in the open labor market." 287 F.3d at 1290. If substantial evidence does exist, consideration of vocational expert evidence was unnecessary, and the court will not find an abuse of discretion for ODFL's failure to do so. Id.

In making this decision, the court finds it helpful to compare the circumstances in the instant case to those present in other cases deciding the same question. In Block v. Pitney Bowes Inc., 952 F.2d 1450 (D.C. Cir. 1992), for example, a plaintiff suffered a serious injury in the course of his employment as a sales representative. Id. at 1451. On account of that injury, the plaintiff was restricted by his physician to "limitations on standing (two hours), walking, lifting (20 pounds), and bending (four out of eight hours)," and he filed suit when his disability plan terminated his long-term disability benefits. Id. at 1452. In ruling that the plan did not abuse its discretion by terminating the benefits without vocational evidence, the court reasoned that "the medically-indicated limitations were not so great, nor [plaintiff's] occupation so specialized, that the [disability plan] could be called unreasonable for refusing to conclude that sales positions in the D.C. area for which [plaintiff] could qualify were scarce." Id. at 1455.

Similarly, in Duhon v. Texaco, Inc., a plaintiff filed for long-term disability benefits after ending his employment as a truck driver because of a degenerative back condition. 15 F.3d at

1034. Plaintiff's treating physicians had restricted him from driving, squatting, stooping, bending, or lifting more than twenty-five pounds, but had also stated that he was still capable of doing "sedentary to light work." Id. at 1304. Based on those limitations, the plaintiff's disability plan administrator concluded that he was not totally disabled under the terms of the plan ("[un]able to perform any job for which he or she is, or may become, qualified by training, education, or experience"). Id. at 1308. Plaintiff then filed suit, arguing that the decision was improper because there was "no evidence in the administrative record illustrating that [plaintiff] can actually perform any identifiable job." Id. at 1307. In concluding that it was not an abuse of discretion for the plan administrator to deny disability benefits under these circumstances—and without vocational evidence—the court stated as follows:

> It was not an abuse of discretion for the plan administrator to conclude that a sixty-five year old man with a high school diploma and plenty of experience in the work-a-day world, although unable to squat, stoop, bend, or lift more than twenty-five pounds, would be able to perform the functions of some identifiable job. Indeed, to find otherwise would be blindly and deliberately to ignore a common—and uncontested—truth: people in their sixties and seventies who have similar physical and job limitations established by this record are employed and employable throughout the workplace today.

Id. at 1308.

The court finds comparable circumstances here. Piepenhagen's "any occupation" claim for long-term disability benefits, as reaffirmed by his remand appeal, was based upon the medical assessments of Dr. Nobbee and Dr. Maiolo, coupled with the purported side-effects of Piepenhagen's medications and a preexisting injury to his fingers. Nothing in the Administrative Record, however, supports Piepenhagen's assertion that either his medications or the preexisting injury to his fingers would prevent employment in any occupation.[9] Consequently, ODFL was

---

[9] As part of his original appeal to the termination of his benefits, Piepenhagen complains that his "medications have the side effects of causing him to feel fatigued, light-headed, poor concentration or poor memory." (A.R. at 113). However, there is no medical evidence in the record to support Piepenhagen's assertion, and to the contrary, one of

left to determine Piepenhagen's eligibility according to the medical assessments of Dr. Maiolo and Dr. Nobbee, reports which this court has already found to be substantial evidence of Piepenhagen's ability to perform "low stress jobs" in the open labor market. Under these circumstances, it was not an abuse of discretion for ODFL to not conduct a vocational analysis.[10]

---

Dr. Maiolo's responses in the Cardiac Residual Function Questionnaire indicates that the opposite is true. (See A.R. at 150) (in response to the question "Describe any side effects of your patient's medication and identify any implications for working," Dr. Maiolo wrote "N/A" [i.e., Not Applicable]). Similarly, there is no indication in any of the medical evidence to suggest that the preexisting finger injury was of such an extent as to prevent Piepenhagen from being qualified for any occupation.

[10] In coming to this conclusion, the court finds it appropriate to distinguish the facts in the instant case from those in various cases cited by Piepenhagen. For example, Piepenhagen relies on Demirovic v. Bldg. Serv. 32 B-J Pension Fund, 467 F.3d 208 (2d Cir. 2006), for the argument that consideration of vocational evidence was necessary under the circumstances here. In Demirovic, the Second Circuit held that a plan administrator's decision to terminate disability benefits was arbitrary and capricious because the administrator failed to conduct a vocational analysis. Id. at 216. In coming to this decision, the court notes that the plaintiff had "worked as an unskilled manual laborer for nearly thirty years and her facility with the English language [was] sufficiently limited that she required her son to act as a translator during her [physician] examination." Id. at 213. Under those circumstances, the court reasoned that "a proper inquiry would require not only a medical assessment of [the plaintiff's] physical capacity to perform both physical and sedentary work, but also a non-medical assessment as to whether she has the vocational capacity to perform any type of work – of a type that actually exists in the national economy – that permits her to earn a reasonably substantial income from her employment, rising to the dignity of an income or livelihood." Id. at 215. In the instant case, these same types of circumstances do not exist. Piepenhagen had not worked as an unskilled manual laborer for thirty years and his facility with English is not limited. Moreover, ODFL explained in its February 8, 2008 denial letter that did take into account all of Piepenhagen's vocational circumstances by considering both the work restrictions imposed by Dr. Maiolo and Dr. Nobbee and the possibility—and the lack of evidence in the Administrative Record relating thereto—that Piepenhagen's preexisting finger injury might prevent him from being qualified for other jobs.

Similarly, Piepenhagen relies heavily on a Seventh Circuit case, Tate v. Long Term Disability Plan for Salaried Emples. of Champion Int'l Corp. # 506, 545 F.3d 555 (7th Cir. 2008), for the same argument. In Tate, the Seventh Circuit ruled that a disability plan's decision to terminate disability benefits was arbitrary and capricious because the plan administrator failed to conduct a vocational analysis and assess how the plaintiff's qualifications might comport with jobs that she might be able to perform in spite of her impairments. Id. at 562. The court reasoned that when there is evidence in the record to prove that a plaintiff is "not capable of performing any job," "for the Plan to make a reasonable determination that [the plaintiff] was able to work in an occupation for which she was qualified despite her impairments, the Plan was required, at minimum, to assess her qualifications and how they comport with jobs that [the plaintiff] might be able to perform in spite of her impairments." Id. at 562. In the instant case, however, Piepenhagen has not established through evidence in the Administrative Record that he was not capable of performing any job. As a result, the burden to consider vocational evidence does not fall upon ODFL.

Finally, Piepenhagen claims that the facts present in Holland v. Ret. Plan of Int'l Paper Co., 2008 U.S. Dist. LEXIS 67133 (W.D. La. Sept. 4, 2008), are analogous to those present here. In Holland, a Western District of Louisiana District Court found a plan administrator's decision to terminate disability benefits arbitrary and capricious because the plan administrator failed to conduct a vocational analysis. Id. at *17. In coming to that decision, the court stressed that the medical restrictions of Holland's treating physicians prevented him from "heavy, labor intensive" jobs, work which he had done "almost exclusively . . . for over thirty years." Id. at *15. The court also focused on the fact that one of the disability plan's own treating physicians had recommended that Holland undergo "vocational rehabilitation for an alternative job that [Holland] [could] perform within [his] restrictions." Id. In the instant case,

To find otherwise would be for the court to "blindly and deliberately to ignore a common—and uncontested—truth," that people with similar restrictions as Piepenhagen (i.e., an ability to walk two city blocks without rest, occasionally lift twenty pounds and occasionally twist, stoop (bend), crouch, climb ladders and climb stairs, but needing to sit down/stand up and/or take periodic breaks throughout the day) are "employed and employable throughout the workplace today." Duhon, 15 F.3d at 1034.

## C. Independent Medical Analysis

In a similar vein, Piepenhagen also contends that ODFL's decision to deny him benefits was an abuse of discretion because it failed to have a medical expert of any type review or assess his medical condition. As part of its remand appeal review process, ODFL conducted "an independent review" of Piepenhagen's claim "without deference to the original decision to deny benefits," (A.R. at 172), but Piepenhagen argues this file review was insufficient to constitute a "full and fair" review of his claim. According to Piepenhagen, where his treating physicians have rendered unimpeached opinions that he is either permanently disabled and/or suffering from significant day-to-day limitations, it is incumbent upon a plan administrator to obtain independent expert medical advice if it questions or disagrees with such opinions. Piepenhagen claims this is particularly true where, as here, a plan administrator has the power under the terms of the Plan Document to require a disability claimant to submit to a medical examination.

The court finds this line of argument unpersuasive for multiple reasons. First, there is no language in the Plan Document to support it. The Plan Document states that "[t]he plan reserves the right to have [a claimant] examined by a medical specialist(s) at any time after [the claimant] file[s] for disability benefits." (A.R. at 16). This provision, however, in no way obligates ODFL

---

neither one of those facts are present. Piepenhagen had only worked as a truck driver from 1999 until 2005—far from thirty years—and none of his treating physicians recommended that his restrictions were so substantial as to require the aid of a vocational rehabilitation expert.

to conduct an independent medical examination under any circumstances. This is true even when the plan administrator questions or disagrees with the unimpeached opinions of claimant's treating physicians, a circumstance which the court notes is not the case here. To the contrary, ODFL accepts—even relies upon—the opinions of Piepenhagen's treating physicians in explaining why Piepenhagen was not eligible for long-term disability benefits.

Second, there is no per se rule in the law requiring that a plan administrator must conduct an independent medical examination before denying benefits. See Laser v. Provident Life & Accident Ins. Co., 311 F. Supp. 2d 645 (D. Md. 2002) (noting that independent reviews of medical evidence and independent examinations of claimants are not required); Parisi v. UnumProvident Corp., No. 3:03-cv-01425 (DJS), 2007 U.S. Dist. LEXIS 93472, at *50-53 (D. Conn. Dec. 21, 2007) (finding that the plaintiff carries the burden of proving his disability and, thus, it would be unreasonable to demand that the defendant subject the plaintiff to independent medical examination when his own treating physicians did not obtain sufficient proof of disability). Granted, courts have held that "once a claimant makes a prima facie showing of disability through physicians' reports . . . if the [disability plan] wishes to call into question the scientific basis of those reports . . . then the burden will lie with the [disability plan] to support the basis of its objection." Lasser v. Reliance Standard Life Ins. Co., 344 F.3d 381, 391 (3d Cir. 2003). But, Piepenhagen has failed to make a prima facie showing of disability here, and ODFL does not call into question the scientific basis of any of the treating physicians' reports.

Finally, the Fourth Circuit has found under similar circumstances that there is no duty for a plan administrator to develop any evidence that a claimant is not disabled (independent medical evidence or otherwise) before denying benefits. In Lucy v. The Macsteel Serv. Ctr., 107 Fed. App'x 318 (4th Cir. 2004), an employer denied a plaintiff's "own occupation" disability claim on

the basis that the claim relied solely on conclusory statements by the plaintiff's treating physicians that he was disabled. Id. at 321. The plaintiff filed suit, arguing, among other things, that the plan administrator had an obligation to develop evidence indicating that he could perform his job. Id. In ruling against the plaintiff, the court held as follows:

> Assuming a plan administrator has a duty to develop evidence in some circumstances, [the plaintiff] properly concedes that "to trigger this duty the claimant must first come forward with evidence of disability." A plan is under no obligation to develop evidence that the claimant is not disabled before denying benefits when (1) the plan imposes a duty upon the claimant to provide proof of disability at the claimant's expense; (2) the claimant is represented by a lawyer; (3) the claimant provides, on the one hand, medical records that indicate that his condition is improving and, on the other hand, conclusory physician statements that he is disabled; and (4) the plan informs the claimant's lawyer that he must submit more evidence of disability.

Id. at 322 (citations omitted). See also LeFebre v. Westinghouse Elec. Corp. Mgmt. Disability Benefits Plan, 747 F.2d 197, 206 (4th Cir. 1984) (holding that the plan's trustees had no obligation to develop evidence in part because the claimant was represented by a lawyer and the plan's trustees informed the lawyer that they needed additional proof of the claimant's disability).

In the instant case, the same four factors exist: (1) the Plan Document imposes a duty upon Piepenhagen to provide proof of disability at his own expense; (2) Piepenhagen is, and always has been, represented by a lawyer; (3) Dr. Nobbee's assessments indicate that Piepenhagen's condition is improving but also include the words "permanent disability"; and (4) in its denial letters, ODFL informed Piepenhagen that he had not submitted sufficient evidence of disability. Under these circumstances, ODFL "is under no obligation to develop evidence that [Piepenhagen] is not disabled before denying benefits." Lucy, 107 Fed. App'x at 322. Therefore, the court does not conclude that ODFL's failure to have a medical expert of any type review or assess Piepenhagen's medical condition before denying benefits was an abuse of discretion.

## D. Social Security Determination

As a final challenge, Piepenhagen claims that ODFL's decision to deny him benefits was an abuse of discretion because ODFL failed to give proper weight the Social Security Administration's determination that Piepenhagen was eligible for disability income benefits. Pursuant the terms of the Plan Document, long-term disability claimants are "required" to "[a]pply for Social Security benefits," and if such benefits are denied, claimants "must appeal the decision at the expense of [ODFL]." (A.R. at 14). Piepenhagen contends that, under these circumstances, ODFL's decision to "disregard" the findings of the Social Security Administration "strongly suggests" that its decision was an abuse of discretion. (Pl's Mem. in Supp. of Mot. for Summ. J. at 23).

The court disagrees. There is no indication in the Administrative Record that the Plan Document's definition of "total disability" in any way mirrors the relevant definition in the regulations of the Social Security Administration. Cf. Elliot v. Sara Lee Corp., 190 F.3d 601, 607 (4th Cir. 1999) (concluding that the Social Security standard is not analogous to a plan standard under which an employee is disabled if she is unable to engage in "each and every occupation or employment for wage or profit for which . . . she is reasonably qualified by education, training or experience"). In the absence of a similar standard of adjudication, the Fourth Circuit has refused to require ERISA plan administrators to lend greater weight to a SSA determination regarding social security benefits than to any other evidence. See Gallagher v. Reliance Std. Life Ins. Co., 305 F.3d 264, 275 (4th Cir. 2002); Elliot, 190 F.3d at 607 (ruling that without any indication that disability standards are analogous, an ERISA plan administrator had no obligation to weigh a SSA determination more favorably than other evidence). The court, therefore, at most, must consider ODFL's inconsistent treatment of the SSA determination—i.e., requiring Piepenhagen

to apply for SSA disability income benefits and then deciding that he is not disabled—as potential evidence of procedural unfairness. See Glenn, 128 S. Ct. at 2352 (finding an insurer's inconsistent positions regarding a Social Security Administration disability income benefits determination suggestive of procedural unfairness, thereby justifying the court to give more weight to the inherent conflict of interest that arose from the fact that the insurer both evaluated and paid its claims). And, if the court finds other indications of procedural unfairness, see e.g., id. (finding that an insurer's mischaracterization of medical evidence and its failure to provide independent vocational and medical experts with all of the relevant evidence was evidence of procedural unfairness), the court can use that evidence to increase the importance of the conflict of interest factor in its reasonableness determination. Id. at 2351 ("The conflict of interest . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration."); see also Winebarger, 571 F. Supp. 2d at 726-27 (finding an abuse of discretion after weighing a conflict of interest, mischaracterization of medical evidence, and an inconsistent position regarding social security benefits).

In the instant case, however, the court finds no other evidence suggesting procedural unfairness. To the contrary, the court finds, again, that ODFL undertook a "reasoned and principled" decisionmaking process when reviewing Piepenhagen's long-term disability claim. Booth, 201 F.3d at 342-43. This decisionmaking process included, among other things, a consideration of the SSA's disability determination, as the February 8, 2008 denial letter explained:

> The Plan is not governed by or subject to this determination since the Social Security Administration employs standards and guidelines that differ from the

terms of the Plan. While this determination is not binding, <u>this information has been considered</u>. I find this determination <u>unpersuasive in light of the rest of the record</u>.

(A.R. at 173) (emphasis added). The court finds this determination reasonable in light of the fact that the SSA made its determination without any consideration of relevant information that later became available to ODFL—principally, the Cardiac Residual Functional Capacity Questionnaire and any/all assessments by Dr. Maiolo and Dr. Nobbee subsequent to October 15, 2005, the date on which the SSA awarded disability income benefits. The court, therefore, does not view ODFL's failure to give the SSA determination more weight in its decisionmaking process as evidence of procedural unfairness or, by itself, an abuse of discretion.

IV.

In sum, for the forgoing reasons, the court finds that Piepenhagen has not demonstrated that ODFL's administrative decision to deny him long-term disability benefits was an abuse of discretion. Accordingly, the court will **GRANT** ODFL's Motion for Summary Judgment (Docket No. 24) and **DENY** Piepenhagen's Motion for Summary Judgment (Docket No. 22). In so doing, the court will also **DENY** Piepenhagen's request for attorneys fees (Docket No. 27) and **DENY** Piepenhagen's Objections to the Authenticity of the Administrative Record (Docket No. 19), to the extent that Piepenhagen seeks information not already provided by ODFL. The clerk of court is directed to strike the matter from the active docket and to send a copy of this Memorandum Opinion and accompanying Final Order to counsel of record for each party.

**ENTER:** This 27th day of February, 2009.

James C. Turk

Hon. James C. Turk
Senior United States District Judge